IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

REMINGTON LODGING & HOSPITALITY, LLC, a Delaware liability company, and JOSEPH DANTONI, an individual,

Case No. ____________________

Plaintiffs,

v.

THE CITY OF KEY WEST, a Florida Municipal Corporation, SHAWN SMITH, individually and in his official capacity as City Attorney for the City of Key West, DONALD J. LEE, individually and in his official capacity as Chief of the Key West Police Department, KEY WEST POLICE OFFICER DOES 1 THROUGH 10, individually and in their official capacities as Police Officers for the Key West Police Department, SOUTHERNMOST HOUSE, LTD., a Florida limited liability partnership, SOUTHERNMOST HOUSE, INC., a Florida corporation, MICHAEL HALPERN, an individual,

Defendants.
_______________________________________/

**COMPLAINT FOR DEPRIVATION OF DUE PROCESS IN VIOLATION OF 42 U.S.C. § 1983, CONSPIRACY, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS, FRAUDULENT MISREPRESENTATION, BREACH OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, AND CIVIL THEFT**

Plaintiff Remington Lodging & Hospitality, LLC and Joseph Dantoni ("Dantoni"), by and through their undersigned counsel, sue Defendants the City of Key West (the "Key West"), Shawn Smith ("Smith"), and David J. Lee ("Lee"), Police Officer Does 1 through 10 (the "Police

Does"), Southernmost House, Ltd. ("Southernmost"), Southernmost House, Inc. ("Southernmost, Inc."), and Michael Halpern ("Halpern"), and state as follows:

1. This is an action for deprivation of due process in violation of 42 U.S.C. § 1983, conspiracy, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, tortious interference with business relationships, fraudulent misrepresentation, breach of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), and civil theft, with damages totaling more than $1,500,000.00, exclusive of interest, attorneys' fees, and costs.

2. The Court has jurisdiction over this action, pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 1332(a)(1), and 28 U.S.C. § 1367(a).

3. Venue is proper in this Court because the deprivation of due process in violation of 42 U.S.C. § 1983, conspiracy, breaches of contract, breaches of the implied covenant of good faith and fair dealing, breaches of fiduciary duty, tortious interference with business relationships, fraudulent misrepresentation, breach of FDUTPA, and civil theft, which form the basis for this complaint all took place in Monroe County, Florida and because the claims herein all arise out of transactions or occurrences that took place in Monroe County, Florida.

4. Plaintiff Remington is a Delaware limited liability company, headquartered in Dallas, Texas, and doing business throughout the United States, including in Key West, Florida.

5. Plaintiff Dantoni is an individual, *sui juris*, residing in Key West, and working as the General Manager for Remington's Key West hotel properties.

6. Defendant Key West is a Florida municipal corporation in Monroe County, Florida operating under a municipal charter, and it is the operator of the Key West Police Department (the "Police Department").

7. Defendant Smith is an individual, *sui juris*, residing in Key West, Florida, and serving as the City Attorney for Key West.

8. Defendant Lee is an individual, *sui juris*, residing in Key West, Florida, and serving as the Chief of Key West's Police Department.

9. Defendants Police Does 1 through 10 are individuals, *sui juris*, residing in Key West, Florida and serving as officers for the Key West Police Department, whose identities Remington will determine through discovery.

10. Defendant Southernmost is a Florida limited liability partnership, doing business in Key West, Florida, and upon information and belief, its general partner, Southernmost, Inc., and any limited partners are all either Florida entities or individuals residing and doing business in Key West, Florida.

11. Defendant Southernmost, Inc. is a Florida corporation, doing business in Key West, Florida, and it is the general partner of Southernmost.

12. Defendant Halpern is an individual, *sui juris*, residing and doing business in Key West, Florida, and he is the President of Southernmost, Inc.

13. All conditions precedent have been satisfied, occurred, or waived.

14. Remington and Dantoni have engaged the law firm of Heller Waldman, PL to represent them in this action and are obligated to pay the attorneys of Heller Waldman, PL a reasonable fee for their services.

15. Remington is entitled to its attorneys' fees and costs, pursuant to 42 U.S.C. § 1988(b), Fla. Stat. § 521.2105, and Fla. Stat. § 772.11(1), and pursuant to Section 27.05 of the December 1, 2009 Hotel Management Agreement between it and Southernmost (the "Agreement").

16. Dantoni is entitled to his attorneys' fees and costs, pursuant to 42 U.S.C. § 1988(b).

17. Remington and Dantoni reserve the right to amend this Complaint to seek an award of punitive damages for the tortious conduct set forth herein.

## GENERAL ALLEGATIONS

18. This case concerns the improper ouster of hotel manager Remington from the Southernmost House hotel in Key West, Florida (the "Hotel") and the gratuitous, unwarranted arrest of Remington's Key West General Manager, Dantoni, for his presence on the Hotel property, as part of an attempt to protect Remington's rights with respect to the management of that property and Remington's own property at the Hotel.

19. This case also concerns the direct interference of the City Attorney, Police Chief, and numerous police officers in an existent civil dispute involving the Hotel.

20. Southernmost, or its general partner Southernmost, Inc., began operating a licensed bed and breakfast at the Hotel on or around March 26, 2002.[1]

21. The Hotel began operating solely in the circa-1896 Judge Vinning Harris mansion at 1400 Duval Street in Key West.

---

[1] Southernmost House, Inc. is listed as the licensee on the Florida Department of Business and Professional Regulation website.

22. Having dubbed the Hotel as the "Southernmost House in the USA," or alternatively, as the "Southernmost House Grand Hotel & Museum," Southernmost opened the mansion for daily "historic tours," at which visitors could inspect documents, correspondence, photographs, and autographs from the mansion's noteworthy visitors, including Presidents Roosevelt, Truman, and Kennedy, writers Ernest Hemmingway and Tennessee Williams, and Queen Isabel and King Ferdinand of Spain.

23. In addition to hosting historical tours at the Hotel, Southernmost also offered guest rooms for rent, while making the Hotel and its grounds available for "Events & Ceremonies."

24. Early marketing efforts at the Hotel included, among other things, an attempt to use the Hotel's website to advertise sale of what Southernmost called "El Cazador Treasure"—old Spanish silver coins, allegedly recovered from a shipwreck, which Hotel guests and others might purchase during their stay or (eventually) via a planned online interface.

25. Gimmicks like these did little to make the "Southernmost House Grand Hotel and Museum" a success: its occupancy rates lagged badly behind other Key West bed-and-breakfasts with more sophisticated marketing programs, and its guests posted unfavorable reviews of their stays online, noting, among other things, the silverfish bugs crawling the walls, a noxious "museum smell" in the rooms, and too much noise from the locals who bought passes to access the Hotel pool. Copies of the Hotel's Tripadvisor.com reviews for the period when Southernmost managed the Hotel are attached hereto as Exhibit A.[2]

---

[2] The earliest of these reviews is from March of 2006; the latest is from November of 2009.

26. In 2007 and 2008—the first two years in which the Hotel received a significant number of online reviews—the Hotel rated only 3.33 stars out of 5 on Tripadvisor.com. *See* Exhibit A.

27. It rated only 3.11 starts out of 5 on Expedia.com during that same period.

28. In 2009, reviews of the Hotel rebounded somewhat, and Southernmost incorporated the Lopez House property at 1401 Duval Street into the Hotel, adding five more rooms to the 13-rooms available at the Judge Vinning Harris mansion. *See id*.

29. Notwithstanding these improvements, the Hotel's business continued to lag and Southernmost entered into negotiations with Remington to take over the operation of the Hotel at or around the time that Southernmost added these five additional rooms to the Hotel.

30. Remington presently manages and operates more than 94 hotels in 28 states, including hotels under internationally recognizable brands, such as Marriott, Renaissance, Hilton, Hyatt, and Westin.

31. When it began negotiations with Southernmost in 2009, Remington already had one other Key West hotel property under management: the 160 room La Concha Hotel & Spa ("La Concha").

32. Unlike the Hotel, which struggled with a rudimentary webpage and an inefficient online reservation system, La Concha had a slick, state-of-the-art website, which allowed for "virtual tours" and instant information about room availability.

33. Southernmost sought not only to upgrade the Hotel's marketing and online presence, but also to professionalize the Hotel's operations.

34. As a result of its conversion from a historic residence to a lodging house and its seven years of operations as a family business under Southernmost's Halpern, the Hotel had numerous inefficiencies, quirks, and maintenance challenges.

35. In addition to the terrible smell and silverfish infestation, the Hotel employed and an out-of-date paper ticket system for selling day-passes to allow locals and non-Hotel guests to access the Hotel's pool and amenities, and it operated a poolside bar without a modern point of sale system.

36. The seaside air subjected metalwork and various fixtures at the Hotel to constant corrosion, and numerous repairs remained significantly past-due.

37. At just 18 rooms and with high potential repair and upkeep costs due to its age and seaside location, the Hotel did not—and could not—by itself generate sufficient profits to lure a major hotelier, like Remington, to take over its management.

38. Accordingly, Remington insisted on, and ultimately negotiated with Southernmost, numerous contractual terms to protect the investment that its management would represent for the Hotel property and to allow it to maximize the value that it generated through its work at the Hotel, with minimal to no interference from Southernmost or Halpern.

39. These terms included, *inter alia*: (a) provisions allowing Remington to integrate the Hotel into its existing Key West and national operations, so as to take advantage of certain economies of scale, including those arising from synergies between the Hotel, La Concha, and any other Key West hotel it might add; (b) provisions granting Remington broad, sole, and exclusive authority over the management and operation of the Hotel and Hotel employees; (c) provisions limiting Remington's performance requirements to following basic legal obligations

and meeting certain objective revenue goals that it would agree upon with Southernmost; (d) provisions providing Remington with robust notice and cure protections in the event of any default; (e) provisions securing a lengthy contract term for Remington with multiple options to extend the commitment for a period of up to 25 years; and (f) mechanisms to deter the agreement's early termination, such as limitation on termination rights during the first five years of the agreement and the imposition of a substantial termination fee. A copy of the Agreement is attached as Exhibit B.

40. To cut labor costs—which represented perhaps the highest expense in the budget for the Hotel's operation—Remington and Southernmost agreed (or Southernmost purported to agree) that Remington could use employees from La Concha or any other Remington property or office[3] to perform services at or for the Hotel, while allocating to the Hotel a pro rata share of these employees' salary or wages "on a fair and equitable basis." *See* Exhibit B at Section 6.03.

41. To further streamline the Hotel's cost structure, Remington and Southernmost also agreed (or Southernmost purported to agree) that Remington could provide a number of "Group Services" to the Hotel "on a central or regional basis," including "without limitation": (a) marketing, advertising, and promotion; (b) accounting, payroll processing, and administration of accounts payable and receivable; (c) recruiting, training, and career development; (d) employee benefits administration; (e) engineering and risk management; (f) information technology; (g) legal support; (h) purchasing; (i) internal audit services; and (j) reservation systems. *See id.*

---

[3] In May of 2013, Remington took over management of Key West's Pier House Hotel & Spa ("Pier House"), and Remington employees from Pier House also began to work at and perform services for the Hotel.

42. With respect to hiring, training, promotion, supervision, direction, and discharge of employees performing work at the Hotel or providing "Group Services" for it, Remington insisted—and Southernmost agreed or purported to agree—that Southernmost would grant Remington "**absolute discretion**" and permit it to be "**the sole judge**" of each employee's "fitness and qualification." *See id*. at Section 9.01 (emphasis added).

43. In Section 9.03 of the Agreement, Remington and Southernmost reinforced (or Southernmost purported to reinforce) the absolute nature of Remington's control over employees associated with the Hotel by acknowledging that they "understood and agreed" that all personnel at the Hotel would "be the employees of [Remington] **for all purposes.**" *See id.* at Section 9.03 (emphasis added).

44. Notwithstanding the fact that Remington exercised absolute discretion over the Hotel's employees and Southernmost's lack of any control over those employees, Southernmost also agreed (or purported to agree) that it would:

> save and hold [Remington] harmless of and from all cost, expense or loss in any way properly incurred in connection with such employees (including reasonable attorneys' fees and expenses) and any liability, costs, fines, penalties, or obligations under federal, state or local law requiring continuation of employee benefits, severance pay, vacation or sick pay, or similar matters; or incurred in connection with applicable plant closing laws or statues, pertaining to any prior or current employees of [Southernmost] or any Predecessor Manager; to the end that [Remington] will bear no economic burden in connection with the employment of such persons (which such indemnity shall survive any termination of this Agreement). Additionally, [Remington] shall not be liable to [Southernmost] or to any others for any acts or omissions on the part of such personnel. Further, [Southernmost] will indemnify [Remington] with respect to all loss, cost or expense incurred, directly or indirectly, by reason of any such acts or omissions except for [Remington's] gross negligence or willful misconduct (which such indemnity shall survive any termination of this

> Agreement), provided, however, that the act or omission of any employee which constitutes gross negligence or willful misconduct will not constitute the gross negligence or willful misconduct of [Remington].

*See id*. at Section 9.03.

45. Southernmost also agreed (or purported to agree) to reinforce this commitment with an additional statement of its indemnification obligations to Remington. *See id*., Section 25.02.

46. To ensure its control over the Hotel for the duration of the Agreement and safeguard its ability to steer the Hotel to profitability, Remington also required that Southernmost grant it sole and exclusive discretion over all other aspects of the Hotel's management and operations. *See id*., Sections 4.01 and 4.02.

47. Pursuant to Sections 4.01 and 4.02 of the Agreement, Southernmost named Remington its agent, appointed Remington as "its sole, exclusive and continuing operator and manager to supervise and direct . . . the management and operation of the [Hotel]," and delegated to Remington the entirety of its authority, agreeing (or purporting to agree) that

> **The operation of the [Hotel] shall be under the exclusive supervision and control of [Remington]** who, except as otherwise specifically provided in this Agreement, shall be responsible for the proper and efficient management and operation of the [Hotel] in accordance with the Applicable Standards. Subject to the terms of this Agreement, **[Remington] shall have discretion and control in all matters relating to the management and operation of the [Hotel], including, without limitation, charges for rooms and commercial space, the determination of credit policies (including entering into agreements with credit card organizations), food and beverage service and policies, employment policies, procurement of inventories, supplies and services, promotion, advertising, publicity and marketing, and, generally, all activities necessary for the operation of the [Hotel]**. [Remington] shall also be

> responsible for the receipt, holding and disbursement of funds and maintenance of bank accounts in compliance with applicable Cash Management Agreements if any.

*See id*. at Section 4.02 (emphasis added).

48. In Article XVII of the Agreement, Remington and Southernmost reiterated the exclusive nature of Remington's control over the Hotel, stating that:

> **[Southernmost] hereby agrees and vests [Remington] with the sole and exclusive right to manage and operate the [Hotel], and [Southernmost] agrees that it will not itself engage in any actions that could be construed as management of the [Hotel]**, including without limitation, communication, interaction with or direction of [Hotel] employees, guests or vendors except as otherwise expressly permitted herein. All [Southernmost] inquiries regarding operation of the [Hotel] will be directed to [Remington].

*See id*. at Article XVII (emphasis added).

49. In this Article XVII of the Agreement, Remington and Southernmost made clear as well that Remington's "sole and exclusive right to manage and operate the [Hotel]" did not deprive Remington of its ability to run competing hotel properties or constrain that ability in any way, providing that:

> Nothing contained herein shall prohibit or restrict [Remington] or any of its Affiliates from operating, owning, managing, leasing or constructing any hotel of any nature or description which may in any manner compete with that of the [Hotel].

*See id*.

50. In turn, Remington agreed to "be responsible for proper and efficient management and operation of the [Hotel] in accordance with the Applicable Standards." *See id*. at Section 4.01.


HELLER WALDMAN, P.L.
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

51. These "Applicable Standards" for the management and operation of the Hotel further secured Remington's control and discretion.

52. In Section 1.01 of the Agreement, Remington and Southernmost defined the "Applicable Standards" as:

> [S]tandards of operation for the [Hotel] which are materially (a) in accordance with the requirements of the Franchise Agreement, this Agreement and all CCRs affecting the [Hotel] and of which true, correct and complete copies have been made available by [Southernmost] to [Remington], (b) in accordance with applicable Legal Requirements, (c) in accordance with the terms and conditions of any Hotel Mortgage to the extent not otherwise inconsistent with the terms of this Agreement (to the extent [Remington] has been given written notice thereof and has been provided by [Southernmost] true and complete copies of the applicable loan documents relating to any such Hotel Mortgage), and (d) in accordance with the requirements of any carrier having insurance on the Hotel or any part thereof, but only with respect to insurance [Remington] is required to maintain under this Agreement or with regard to policies for insurance that [Remington] does not maintain, only to the extent [Remington] has been given written notice and true, correct and complete copies of such policies.

*See id*. at Section 1.01.

53. The Hotel is not, and has never been, a franchise for a national or international hotel brand, and neither Remington, nor Southernmost, is, or have even been, the party to a franchise agreement with respect to the Hotel.

54. Upon information and belief, any mention of a "Franchise Agreement" in the Agreement is a scrivener's error, and no Franchise Agreement of any kind defines the "Applicable Standards." *See id*. at Section 1.01.

55. Pursuant to Section 1.01, the CCRs—which Southernmost and Remington did define as Applicable Standards—are the "restrictive covenants" encumbering the real property upon which the Hotel is situated. *See id*.

56. Pursuant to Section 1.01, the "Legal Requirements"—which Southernmost and Remington did define as Applicable Standards—are "all laws, statutes, ordinances, orders, rules, regulations, permits, licenses, authorizations, directions and requirements of all governments and governmental authorities, which now or hereafter may be applicable to . . . the operation of the Hotel." *See id*.

57. In Section 6.01 of the Agreement, the Remington and Southernmost agreed "Standard of Operation" for the Hotel would not only come from the Applicable Standards, but also from an Annual Operating Budget, providing that that Remington would "manage the [Hotel], for the account of [Southernmost], and so far as is legally possible, in accordance with the Annual Operating Budget and Applicable Standards subject to Force Majeure." *See id*. at Section 6.01.

58. As such, Southernmost and Remington agreed to look to two things in evaluating whether Remington is meeting the requisite "Standard of Operation" for the Hotel:

a. The Applicable Standards, which consist of (i) the requirements of the Agreement, (ii) the requirements of any covenants running with the land affecting the Hotel (i.e., the CCRs), (iii) the Legal requirements, such as the Florida Statutes and Monroe County Ordinances; (iv) the terms and conditions of any mortgage on the Hotel; and (v) certain insurance requirements; and

b. The Annual Operating Budget, which sets forth in reasonable detail "an estimated profit and loss statement for the next twelve (12) Accounting Periods" and projects certain performance metrics over that period, such as (i) room occupancy rates, (ii) RevPAR, (iii) room sales, (iv) food and beverage sales and costs, (v) minor income and expenses, such as those associated with valet parking, (vi) administrative and general expenses, (vii) marketing expenses, (viii) maintenance expenses, (ix) other costs, such as energy and Remington's management fee (x) capital expenditures, (xi) available cash flow, and (xi) the Hotel's Competitive Set, a list of comparable Hotels identified by name and by their Smith Travel Research Report number.

*See id*. at Sections 1.01, 6.01, 10.01 and Exhibit D to the Agreement.

59. The Annual Operating Budget introduced two concepts for measuring the performance of Remington and the Hotel: "RevPAR" and the Hotel's "Competitive Set."

60. Under Section 1.01 of the Agreement, Remington and Southernmost defined the "Competitive Set" for Hotel as "other competitive hotels situated in the same market segment as the Hotel and shall include the Hotel, Cypress House, Santa Maria Suites Resort, Wicker Guesthouse, Westwinds Inn, Andrews Inn & Garden Cottages and Le Mer/Dewey House." *See id*. at Section 1.01.

61. With respect to this definition of "Competitive Set," Southernmost and Remington agreed that they would review and revise it "as necessary on an annual basis or otherwise by mutual agreement . . . to select hotels which reasonably and accurately reflect a set

within the market of the Hotel that is comparable in rate, quality and in operation to the Hotel." *See id*.

62. Upon information and belief, the parties have never reviewed, revised, or agreed upon a different "Competitive Set" from the one that they defined in Section 1.01 of the Agreement.

63. Under Section 1.01 of the Agreement, Southernmost and Remington defined "RevPAR" as:

> [T]he revenue per available room, determined by taking the actual occupancy rate of the Hotel and multiplying such rate by the actual average daily rate of the Hotel (or in the case of a determination of RevPAR with respect to the Competitive Set, the actual occupancy rate of the hotels within the Competitive Set and multiplying such rate by the actual average daily rate of the hotels within the Competitive Set).

*See id*.

64. In Section 1.01, the parties also defined the concept of the "Hotel's RevPAR Yield Penetration," which measured the Hotel's RevPAR against its Competitive Set, providing that:

> "Hotel's RevPAR Yield Penetration" shall mean for any applicable Fiscal Year (i) the Hotel's actual RevPAR, divided by (ii) the Competitive Set's actual RevPAR for the same Fiscal Year. The determination of the Competitive Set's occupancy and rate shall be made by reference to the Smith Travel Research Reports or its successor or comparable market research reports prepared by another nationally recognized hospitality firm reasonably acceptable to Manager.

*See id*.

65. Thus, each Annual Operating Budget would include projections for the revenue of the Hotel's 18 rooms, and on a regular basis Remington's performance would be evaluated in

terms of how well the Hotel generated revenue per available room versus its Competitive Set. *See id*. at Sections 1.01, 10.01, and Exhibit D.

66. Aside from the Annual Operating Budget and the Applicable Standards, the Agreement contained only a few specific directives with regard to Remington's performance, in keeping with Southernmost's grant of broad discretion and exclusive control to Remington. *See id*. at Sections 4.01, 4.02, 9.01, and Article XVII.

67. Under Section 8.01 of the Agreement, Remington agreed to "maintain the [Hotel] in good repair and condition as required by the Applicable Standards." *See id*. at Section 8.01.

68. Under Section 15.01, Remington agreed to "maintain an adequate and separate accounting system in connection with its management and operation of the [Hotel]" and to keep books and records "in accordance with GAAP and the Uniform System of Accounts." *See id*. at Section 15.01.

69. Under Section 6.02 of the Agreement, Remington agreed that it "shall materially comply with and abide by all applicable Legal Requirements of any federal, state, or municipal authority . . . ." *See id*. at Section 6.02.

70. All of the foregoing commitments are part of the Applicable Standards. *See id*. at Section 1.01.

71. Remington and Southernmost agreed (or Southernmost purported to agree) that Remington's maintenance of the "Standard of Operation" for the Hotel would entitle Remington to a "Management Fee," which consisted of: a "Property Management Fee" of $6,000.00 per month, subject to CPI adjustments; an annual "Property Management Incentive Fee" equal to 50% of the Hotel's annual "Gross Operating Profit" over $420,000.00; and a "Project

Management Fee" and "Market Service Fee" in connection with any Capital Improvements to the Hotel. *See id*. at Sections 1.01, 8.01.F, and 11.01.A-B.

72. Because it anticipated that it might take a period of years for the Hotel's operations to generate a return on its investment and synergies with its other Key West operations, Remington insisted upon and Southernmost agreed upon (or purported to agree upon) a long-term commitment: the initial contract period would run for 10 years, ending on November 30, 2019, and after that, Remington would have the option to renew the Agreement for three additional five-year terms, until November 30, 2034. *See id*. at Section 2.01.

73. In keeping with this, Section 2.03.A of the Agreement provided that if Southernmost decided to sell the Hotel, Remington would hold a right of first refusal, which would allow it to purchase the Hotel itself for an amount equal to the amount a third-party buyer offered, and thereby avoid being ousted from the Hotel by a new owner. *See id*. at Section 2.03.A.

74. In addition to this right of first refusal, Remington insisted on other protections to ensure the durability of its long-term commitment to manage the Hotel: pursuant to Section 2.03.D of the Agreement, Southernmost would be required to pay Remington a "termination fee" in the event that it terminated the Agreement "without cause." *See id*. at Section 2.03.D.

75. This termination fee would be equal to or greater than three years' worth of the most recent Management Fee that Remington received under the Agreement, and it would be due "upon" termination. *See id*.

76. Under Section 2.03.C of the Agreement, Southernmost further stipulated that it would not be able to exercise its right to terminate Remington without cause for the first five

years of the Agreement—i.e., from December 1, 2009 to December 1, 2014. *See id*. at Section 2.03.C-D.

77. Moreover, even if Southernmost exercised its termination right "without cause," it could not oust Remington from the Hotel immediately: it had to provide Remington with 180 days' notice, and a minimum of 60 days to vacate the Hotel, *after* such a termination. *See id*. at Section 2.03.C.

78. The Agreement provided Southernmost with two different ways to terminate its relationship with Remington without paying the "termination fee": the occurrence of a "Performance Failure" in two consecutive years, or the occurrence of an "Event of Default." *See id*. at Sections 2.03.E and 19.01.

79. The concept of a "Performance Failure" highlighted the significance of the Hotel's RevPAR Yield Penetration—i.e., the revenue per available room versus the revenue per available room generated by the Hotel's Competitive Set. *See id*. at Section 2.03.E.

80. Under Section 2.03.E of the Agreement a Performance Failure could only occur when, for two consecutive years, the Hotel failed to generate at least 80% of the Gross Operating Profit that Remington and Southernmost had projected in the Annual Operating Budget **and** the Hotel's RevPAR Yield Penetration failed to equal the Targeted RevPAR Yield Penetration that the parties had projected in the Annual Operating Budget. *See id*.

81. But the Agreement protected Remington in the event of such an eventuality: upon notice of a "Performance Failure," Remington would have 30 days to submit an "Action Plan" to Southernmost, detailing how it would rectify such failure, and Southernmost could only terminate the Agreement upon its rejection of this "Action Plan." *See id*.

82. Under Sections 19.01 of the Agreement, only four "Events of Default" did not require Southernmost or Remington to provide the other with an opportunity to effect a cure:

a. One of the parties' voluntary bankruptcy;

b. Its involuntary bankruptcy;

c. The entry of an court order declaring one of the parties to be bankrupt, insolvent, or under the control of a receiver, trustee, or liquidator;

d. The appointment of a receiver for either party's property.

*See id*. at 19.01.

83. The two remaining types of "Events of Default," however, did require "Notice, specifying said default with reasonable specificity," and a cure opportunity:

a. The failure of either Southernmost or Remington to make any payment required under the Agreement "within ten (10) days after receipt of Notice";

b. The failure of either Southernmost or Remington "to perform, keep or fulfill any of the covenants, undertakings, obligations or conditions set forth in this Agreement and the continuance of such default for a period of thirty (30) days after written notice of said failure."

*See id*. at Sections 9.01.E-F.

84. Under Section 19.01.F., the 30-day deadline for a cure for non-monetary defaults was **<u>not</u>** a hard and fast one: if either Southernmost or Remington could not reasonably cure a given "Event of Default" within 30 days through diligent efforts, its counterpart would be obligated to afford the defaulting party up to three additional 30-day cure periods. *See id*. at Section 19.01.F.

85. This allowed for a total cure period of up to 120 days for defaults other than those related to insolvency or nonpayment. *See id.*

86. Remington further limited Southernmost's right to terminate it by insisting on the inclusion of the following provision in Section 27.02 of the Agreement: "Manager's limited agency established by this Agreement is **coupled with an interest** and may not be terminated by Owner until the expiration of the Term of this Agreement except as otherwise provided in this Agreement." *See id.* at Section 27.02 (emphasis added).

87. Pursuant to Article XXVI of Agreement, the "Agreement and its interpretation, validity and performance shall be governed by the laws of the State of Florida," and in Florida, an "agency **coupled with an interest**" is "not revocable and will in appropriate cases be protected and enforced by courts of equity." *See Bowling v. Nat'l Convoy & Trucking Co.*, 135 So. 541, 544 (Fla. 1931).

88. Under Section 27.02 of the Agreement, the parties can only terminate the Agreement upon "the expiration" of its term, or "as otherwise provided in [the] Agreement"; otherwise, the Agreement, whereby Remington serves as Southernmost's agent, is "not revocable" and enforceable in equity. *See id.*

89. Aside from these limited termination rights, Remington ceded almost no power to Southernmost under the Agreement, with two important exceptions.

a. First, pursuant to Sections 8.02.D and 10.02 of the Agreement, Southernmost maintained the "power of the purse" over the Hotel, reserving the right to approve or disapprove of the Hotel's Capital Improvement Budget and Annual Operating Budget. *See id.* at Sections 8.02.D and 10.02.

b. As part of this control, if Southernmost objected to a Capital Improvement Budget and refused to increase the Capital Improvement Reserve that it and Remington set aside for the Capital Improvement Budget (which covered"[r]eplacement and renewals to the [Hotel's furniture, fixtures, and equipment" and "[c]ertain non-routine repairs to the [Hotel's] buildings," such as "exterior and interior repainting, resurfacing, building walls, floors, roofs and parking areas" and "major repairs, alternations, improvements, renewals or replacement to the [Hotel's] building structure or to its mechanical, electrical, heating, ventilating, air conditioning, plumbing or vertical transportation system"), then Remington's only recourse would be to either pay for the repairs itself or to terminate the Agreement. *See id*. at Sections 8.01-8.02.

c. Second, the Agreement also ensured that Southernmost would retain ownership of the Hotel's books and records and be able to avail itself of a right to inspect the Hotel "at any and all reasonable times," with notice to permit Remington to make a manager available. *See id*. at Sections 6.04 and 24.04.

d. Under these provisions, Southernmost had the ability to monitor and know about the entirety of the Hotel's operations at all times. *See id*.

90. Halpern negotiated the Agreement on behalf of Southernmost and he executed the Agreement on its behalf, in his capacity as the President of Southernmost's general partner, Southernmost, Inc.

91. Upon information and belief, notwithstanding Halpern's specific assurances to Remington and his execution of the Agreement, neither Halpern, nor Southernmost ever intended for Southernmost to honor a long-term commitment to Remington, or to perform the Agreement for its ten-year initial term, let alone for any of the three successive five-year option periods.

92. Instead, upon information and belief, Halpern and Southernmost intended for Southernmost to wait until Remington completed certain costly repairs and improvements at the Hotel and until the Hotel developed a strong marketing presence and online identity and maintained regular and sustainable profits, and then for Southernmost either to force Remington into renegotiating the Agreement or to undertake a deceptive plan to terminate the Agreement for cause, so as to avoid paying Remington the termination fee.

93. After Remington took over the Hotel in December of 2009, it grew more profitable. A chart detailing the Hotel's profitability from 2010 to 2015 is attached hereto as Exhibit C.

94. During the six-year period from 2010 to 2015, the Hotel's total revenues have steadily increased, rising from $1,211,949.00 in 2010, to $1,530,833.00 in 2011, to $1,569,640.00 in 2012, to $1,883,009.00 in 2013, to $2,009,947.00 in 2014, and to $2,133,270.00 in 2015. *See* Exhibit C at 1.

95. As the Hotel's total revenues increased, Remington's Property Management Incentive Fee increased as well, rising from $110,663.00 in 2011, to $121,513.00 in 2012, to $221,796.00 in 2013, to $296,072.00 in 2014, and to $342,239.00 in 2015. *See id.* at 2.

96. 2015 was the Hotel's most successful year ever: its occupancy exceeded 90% (up from 52% in 2009) and it made $1,177,543.00 in Gross Operating Profits (more than double the $490,739.00 from 2010). *See id*. at 1-2.

97. Customer satisfaction with the Hotel followed suit: Remington's tracking of all online reviews of the hotel for 2014 and 2015—which covers the relevant time period in Southernmost's Complaint and its Receivership Motion—showed that the average review for the Hotel on a five-star scale had increased from 4.46 to 4.51 stars. A copy of the Hotel's record compiling its online reviews for 2014 and 2015 is attached hereto as Exhibit D.

98. On the highly influential travel site Tripadvisor.com, the Hotel's 4.5 out of 5 star rating was only exceeded by one hotel within the Hotel's "Competitive Set": the consistently pricier Santa Maria Suites Resort.

99. The Hotel's 2015 STR report—a regular, third-party-compiled report comparing the Hotel's performance against similar hotel properties both locally and throughout the country—also evidenced a high level of guest satisfaction with 93.8% of the Hotel's surveyed guests rating the "cleanliness" of the Hotel's common areas and facilities very good or better; 96.1% rating the quality of the Hotel and the character in which its entryway and lobby are maintained very good or better; 91.3% rating the cleanliness of their room at the Hotel very good or better; 91.7% rating the cleanliness of their room's bathroom very good or better; and 92% rating the "overall positive experience" at the Hotel very good or better. A copy of the Hotel's STR report for December 2015 is attached hereto as Exhibit E.

100. These guest ratings placed the Hotel within the top quartile of 230 comparable independent hotels in the United States for the year 2015.


HELLER WALDMAN, P.L.
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

101. During this time, Remington not only improved the marketing of the Hotel through a dedicated website, with mobile access, it also began to feature the Hotel as part of a portfolio of Key West tourist destinations comprised of the Hotel, La Concha, and the Pier House Hotel & Spa ("Pier House"), which Remington promoted under a new, "Duval Collection" brand, aimed at maximizing synergies between all of its Key West hotels.

102. But even as the Hotel built on its year-over-year success and took its place among a well-regarded collection of properties in Remington's luxury division, Southernmost—through Halpern—began to interfere in its operations, in direct contravention of Southernmost's delegation of authority to Remington and its agreement not to "engage in any actions that could be construed as management of the [Hotel]." *See* Exhibit B, Section 4.02 and Article XVII.

103. Starting in or around early 2012, Halpern began to appear at the Hotel unannounced, without arranging his visits with Remington management.

104. During these appearances, which grew more and more frequent, he began to announce himself as the owner of the Hotel and not only to interact with Remington employees at the Hotel, but also to direct and interfere with their work.

105. Halpern regularly visited the Hotel's poolside bar, observing its operations, and haranguing Remington employees about what he alleged to be their failure to complete basic tasks, like emptying ashtrays.

106. He went into the Hotel's 18 guest rooms after their occupants had vacated them and complained about lapses by housekeepers and maintenance problems.


HELLER WALDMAN, P.L.
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

107. He regularly lectured the Hotel's front desk staff, the innkeepers who Remington assigned to the Hotel, as well as the general managers who ran the Hotel along with Remington's other Key West properties.

108. Remington employees working at the Hotel or providing services for it struggled to deal with Halpern.

109. They knew him to be an important person—the Hotel's owner and prominent figure in Key West., but he complained about them and about Remington, confusing them as to whose directives to follow, and placing them "in the middle" of a dispute that he alone seemed to be fermenting.

110. As a direct and proximate result of Halpern's interference in the management of the Hotel, multiple Remington managerial employees resigned their positions, forcing Remington to recruit, hire, and train replacements at considerable expense, undermining the morale of the Hotel's staff, and disrupting the Hotel's operations.

111. Moreover, as a direct and proximate result of Halpern's interference in the management of the Hotel, multiple hourly employees also cited Halpern's conduct as a grounds for their resignation, forcing Remington to recruit, hire, and train replacements, undermining the morale of the Hotel's staff, and disrupting the Hotel's operations.

112. By early 2015, Halpern's interference at the Hotel had become such an issue that Remington asked its employees to keep notes of any incidents involving him.

113. For example, in a handwritten letter that she submitted to Remington on or around January 27, 2015, Hotel bartender Erika Hart ("Hart") explained that she had "experienced

several situations" with Halpern, which "ha[d] made [her] feel uncomfortable" and described her interactions with him as follows:

> [Halpern] seems to enjoy to reprimand me + down talk to me [*sic*] especially in front of guests. He even at times has been very aggressive towards me about a guest having an ashtray—in front of other guests! Not professional [*sic*] [Halpern] doesn't seem to understand hotel logistics—exp.–how guests use garbage cans after I am gone, or pool chairs, or ashtrays and even the bar [illegible] The rest of the staff seems on edge + nervous everytime [*sic*] he is around [*sic*] which totally changes our fun happy dynamic [*sic*]

A copy of Hart's handwritten letter is attached hereto as Exhibit F.

114. In the months after Hart submitted this letter to Remington, Halpern intensified his interference with the work of Remington employees of the Hotel and undertook even more efforts to complain to these employees about the inevitable issues that arose in the day-to-day management of the Hotel.

115. In conjunction with these complaints, he began to complain about the amount of Remington's Property Management Incentive Fee and its share of the Hotel's profits under the Agreement.

116. As his campaign to malign Remington and Hotel's operations wore on, Halpern also refused to approve important items in the Capital Improvement Budget that Remington had prepared.

117. These items included necessary and overdue maintenance projects.

118. In discussions with Remington Division Vice President Sileshi Mengiste ("Mengiste"), Halpern made clear that under no circumstances would Southernmost approve these expenses.

119. While Southernmost never did deliver to Remington a "CIB Objection Notice" regarding these items as required under Agreement Section 8.02.D, Remington declined to challenge Southernmost's objections on this basis, given that over the course of the Agreement's performance, it and Southernmost had instead handled budget matters informally, via email and phone conversations. *See* Exhibit B, Section 8.02.D.

120. Because Halpern remained adamant about Southernmost's rejection of the budget that Remington had proposed, Remington opted to delay certain repairs and to complete others on a provisional basis.

121. Its only other options, under Section 8.02.D of the Agreement, would have been to "elect to terminate the Agreement on thirty (30) days written notice," while Southernmost and Remington made whatever efforts they could to resolve the dispute, or to pay for the repairs itself. *See id*.

122. Southernmost's insistence on inadequate Capital Improvement Budgets had the effort of wrongfully transferring Southernmost's obligations to pay for the maintenance of the Hotel on to Remington and of delaying and hindering important maintenance projects crucial to the Hotel's continued viability as a desirable tourist destination. *See* Exhibit B, Sections 6.01, 8.01, 8.02.D.

123. During the summer of 2015, Halpern telephoned Remington Chief Legal Officer Robert Haiman ("Haiman"), seeking to renegotiate the Agreement.

124. Southernmost's Halpern argued to Haiman that Remington's Property Management Incentive Fee was too great, considering the services that Remington provided at

the Hotel, and that the regular turnover in Hotel employees, which he himself had caused, had undermined the Hotel's performance.

125. Remington declined to renegotiate any provision of the Agreement.

126. At or around this same time, in July of 2015, Halpern obtained a meeting with Remington CEO Monty Bennett ("Bennett") at the company's headquarters in Dallas, Texas.

127. Halpern met with Bennett for one half-hour and "lectured" Bennett about how to treat Remington's employees and complained about the high turnover rate for Hotel employees, arguing that Remington caused their departure and that he did not.

128. Halpern also complained about "the level of guest service" at the Hotel, but—crucially—he did not raise any of the other issues that he would eventually raise or concoct when he began his effort to terminate the Agreement for cause.

129. At no time prior to Halpern's attempt to renegotiate the Agreement and his meeting with Bennett did Southernmost ever provide Remington with a written complaint about any aspect of the Hotel's management and operation.

130. Moreover, at no time prior to Halpern's meeting with Bennet and his attempt to renegotiate the Agreement did Southernmost ever challenge the adequacy, accuracy, or completeness of the Hotel's monthly and annual financial statements or engage "an independent national certified public accounting firm with hospitality experience to provide audited financial statements," pursuant to Agreement Section 15.03.

131. Furthermore, for the entire—or almost the entire—period from the summer of 2012 through the summer of 2015, Southernmost regularly had Halpern appearing at the Hotel, regularly interacting with Hotel employees and managers, and regularly observing its operations

in person—and it did not provide Remington with a single written complaint about its performance during that same period.

132. That changed, however, on August 13, 2015, when Southernmost served Remington with a document that it styled as a Notice of Default (the "Notice of Default"). A copy of the Notice of Default is attached to this motion as Exhibit G.

133. In the Notice of Default, Southernmost listed 18 different "Events of Default" that it alleged Remington to have committed under Section 19.01 of the Agreement. *See* Exhibit G at 1-3.

134. Seven of the 18 Events of Default that Southernmost alleged involved what Southernmost described as Remington's failure to perform "in accordance with acceptable standards of the guest house industry," notwithstanding the fact that the parties did not articulate or enumerate such standards in the Agreement. *See id*.

135. The breaches of "acceptable standards of the guest house industry" that Southernmost alleged include:

a. A general "failure to manage the [Hotel]";

b. A general failure "to maintain the [Hotel] in good repair and condition . . . as required under Section 8.01 of the Agreement:;

c. A general failure "to properly supervise personnel working at the [Hotel] . . . as required under Section 9.01 of the Agreement";

d. A general failure "to properly direct the work of personnel at the [Hotel] . . . as required under Section 9.01 of the Agreement";

e. A general failure "to maintain and protect the financial integrity of the business operations conducted [at the Hotel]"; and

f. A general failure "to value [Remington] employees, and treat them with respect and integrity, resulting in employee and management turnover . . . ."

*See id*.

136. The remaining 11 Events of Default similarly did not refer to specific events or conditions. *See id*.

137. To wit, Southernmost alleged that:

a. "[Remington] failed to act as an agent and for account of [Southernmost] as required under Section 4.01 of the Agreement, by entering into competition against the [Hotel]";

b. "[Remington] has failed to maintain an adequate accounting and financial control system . . . as required under Section 15.01 of the Agreement";

c. "[Remington] has left premises uncovered by management for extensive periods of time," so that hourly employees provided "management services," without training or compensation for their performance;

d. "[Remington] negligently handled litigation matters relating to the business operations conducted [at the Hotel]";

e. "[Remington] changed and took management fees pursuant to Section 11.01 of the Agreement for the years 2013, 2014, and 2015 in consideration of services rendered that [Remington] did not render or rendered negligenty";


HELLER WALDMAN, P.L.
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

f. "[Remington] has left the [Hotel] uncovered by management for extensive periods of time," forcing Southernmost "to provide management services [Southernmost] was paying [Remington] to provide";

g. The Hotel suffers from "high management turnover" and one of the Remington's other hotels in Key West "continues to have a poor record of community giving and involvement";

h. "[Remington] has performed its marketing duties in a negligent manner" and "refused to correct the deficiencies in the [Hotel] marketing program";

i. "[Remington"] has wrongfully charged [Southernmost] legal fees for legal services provided to other hotels that managed by [Remington] in which [Southernmost] has no interest";

j. "[Remington] betrayed confidential communications between [Southernmost] and [Remington] causing conflict between [Southernmost] and [an unspecified innkeeper at the Hotel]."

*See id.*

138. Remington responded to the Notice of Default on August 18, 2015, denying that any defaults had occurred, but also requesting that Southernmost permit it to "work through the complaints" that Southernmost had made. *See* August 18, 2015 Letter from Remington's Jim Cowen, Esq. to Southernmost's Michael Halpern, Esq. A copy of this letter is attached to this motion as Exhibit H.

139. Southernmost made no effort whatsoever to work with Remington to resolve the issues that it purported to describe in its Notice of Default and it did nothing to clarify or

otherwise correct the Notice of Default's vague, non-specific language, notwithstanding its obligations to provide reasonably specific notice under Agreement Section 19.01.

140. On October 16, 2015, Southernmost filed a Complaint against Remington in the Circuit Court of the Sixteenth Judicial Circuit in and for Monroe Country, Florida (the "Circuit Court").

141. In the Complaint, Southernmost sought a declaration that Remington had breached the Agreement and that Southernmost could terminate the Agreement for cause, so that Southernmost could avoid paying Remington the termination fee as required under Section 2.03.D of the Agreement. A copy of the Complaint, without exhibits, is attached hereto as Exhibit I.

142. To support its claim for such a declaratory judgment, Southernmost alleged 15 different acts by Remington constituting a breach of the Agreement, including:

a. Remington's purported failure to provide supervisors "as agreed," and the resulting lack of "consistency and continuity" in the Hotel's management and reliance on "hourly employees" to perform management functions;

b. Remington's alleged failure to keep "accurate, detailed records" of the sale of alcoholic and non-alcoholic beverages, due to its failure to install a computerized cash register, and an attendant violation of Fla. Stat. § 212.13 as a result of the cash register's absence;

c. Remington's allegedly permitting non-supervisory personnel—i.e., bartenders—to access liquor storage facilities, without a supervisor present;

d. Remington's allegedly permitting bartenders to conduct inventories of liquor and alcoholic beverages;

e. Remington's alleged failure to implement a system to track the sale and distribution of day-passes admitting non-hotel guests to the Hotel for the use of its pool and amenities;

f. Remington's alleged failure "to staff" the Hotel by hiring unqualified people and failing to train or supervise them;

g. Remington's alleged failure to provide employees with the equipment necessary to perform their work;

h. Remington's alleged failure to maintain the Hotel in good repair and condition by ignoring leaks, allowing roofs to deteriorate, and allowing vegetation to wither and die;

i. Remington's failure to promote the Hotel by leaving the front desk without brochures and maintaining a mobile web application with design deficiencies;

j. Remington's directing those inquiring regarding waterfront rooms and weddings to one of the Other Properties;

k. Remington's allegedly collecting false charges from Southernmost for managerial employees, including a food and beverage manager and a general manager;

l. The alleged failure of Remington's controller to perform her duties, including her duty to pay invoices on a timely basis;

m. The alleged failure of Remington's head housekeeper to appear at the Hotel to inspect it and to stop Remington employees from altering their timecards;

n. Remington's alleged failure to prohibit the operation of an unlicensed massage business at the Hotel; and

o. Remington's alleged acts to condone "employee fraud" by approving altered timecards.

*See* Exhibit I.

143. The majority of these alleged defaults did not appear in the Notice of Default at all, and those that did appear there, if at all, only do so in general terms, with no reference whatsoever to actual factual matters as to the operation of the Hotel or its management. *Compare* Exhibit G *with* Exhibit I.

144. On January 26, 2016, Southernmost made its first gambit to take over the Hotel before obtaining a decision from the Circuit Court as to whether it had a right to terminate the Agreement for cause and could avoid paying Remington a termination fee, filing a Motion for Appointment of Receiver ("Receivership Motion") that introduced new allegations of wrongdoing by Remington, which Southernmost had not bothered to include in either its Notice of Default or Complaint.

145. These new allegations involved matters that Southernmost knew about prior to sending the Notice of Default and filing the action, such as a remotely located outdoor electrical panel which allegedly created a dangerous condition at the Hotel because its door remained ajar, and an incident in which Remington allegedly violated the Florida Beverage Law by transferring liquor from La Concha to the Hotel for sale at the Hotel.

146. On February 17, 2016—after an evidentiary hearing which included a number of irregularities and Southernmost's resort to a number of ambush tactics against Remington—the Circuit Court entered a written order, granting the Receivership Motion and appointing Southernmost's hand-picked receiver, Key West accountant John G. Parks ("Parks"), to take over the Hotel, while the litigation remained pending.

147. Even though Southernmost had just alleged emergency and exigent circumstances that threated the Hotel and its guest, Parks nonetheless asked Remington to continue to run the Hotel until March 1, 2016, when it would be more convenient for him to begin the job.

148. On February 24, 2016, Remington obtained a stay of the Circuit Court's order appointing Parks to take over the Hotel from Florida's Third District Court of Appeal (the "Stay").

149. As of the filing of this Complaint, the Stay remains in effect, and pursuant to it, Remington remained in possession of the Hotel and continued to serve as the Hotel's manager, as the Circuit Court presided over Southernmost's declaratory judgment action.

150. But on October 31, 2016—with the Stay still in place and with Southernmost and Remington still litigating the question of whether Southernmost could terminate the Agreement for cause—Southernmost provided Remington with a "Notice of Intent to Terminate Pursuant to Section 19.02 of the [Agreement]" (the "Termination Notice"), in which it alleged that Remington had "failed to cure defaults in a timely matter, including but not limited to the Events of Default set forth in . . . [the] Notice of Default" and that Remington had "engaged in acts of dishonesty and bad faith and concealed such acts from Southernmost" and that "Remington had

"engaged in a scheme to cheat Southernmost." A copy of Termination Notice is attached hereto as Exhibit J.

151. Remington responded to the Termination Notice on November 4, 2016. A copy of its response is attached hereto as Exhibit K.

152. In its response, Remington insisted that it would not "vacate the Hotel property or cease its performance under the Agreement" until either the Circuit Court ordered it to do so, or until Southernmost paid Remington a termination fee, as Sections 2.03.D and 27.02 of the Agreement require.

153. In proceedings before the Circuit Court, Remington had vigorously contested whether Southernmost could terminate Remington for any of the matters it alleged, including "acts of dishonesty and bad faith" and "a scheme to cheat," when it had failed to provide Remington with proper notice and an opportunity to cure and when it bore the obligation to indemnify Remington for wrongs that Remington employees may have committed.

154. Remington also warned Southernmost not to interfere with its management and operation of the Hotel until and unless Southernmost obtained an order from the Circuit Court requiring Remington to vacate as Southernmost had demanded it to do. *See* Exhibit K.

155. After sending its Termination Notice and receiving this warning from Remington, Southernmost began to engage in deliberate efforts to disrupt Remington's business at the Hotel.

156. On or around November 1, 2016, a front desk agent whom Remington employed at the Hotel Lynn Balkwill ("Balkwill"), promised Remington employees—including fellow front desk agent, Ariel Willis (" Willis")—that he and his wife would be running the Hotel for Halpern sometime after a wedding scheduled to take place there on November 25, 2016.

157. Balkwill invited these employees to come work for Southernmost and/or Halpern and told them that they would receive raises for staying on with the Halpern.

158. At or around this same time, Balkwill began removing and/or copying files and information from Remington computers, to assist Halpern and Southernmost in their takeover effort.

159. Before Remington fired him in connection with such allegations and other wrongdoing on November 12, 2016, Balkwill even admitted to a Remington employee that he had made sure that Halpern would have everything that he needed to run the Hotel without Remington.

160. Also on or around November 1, 2016, two women came to the Hotel and surveyed the Hotel property, as if they meant to inspect it.

161. These women made it a point to tell Remington employees that they would be working at the Hotel for Southernmost starting at the end of November.

162. Several days later, on or around November 9, 2016, Remington contacted its software provider Innquest, Inc. ("Innquest") for a routine service call and learned that Halpern had asked the provider to designate him as the "primary user" for the Hotel and that Halpern had informed the provider that he had taken over the account and that all invoices would need to go through him for approval.

163. Innquest licenses the software for the property management system that the Hotel relies on for booking reservations and managing room rentals.

164. At or around this same time, Remington's manager at the Hotel, Michael Napieralski ("Napieralski"), received mail that suggested that Halpern had begun to attempt to

make good on his intention to take over the Hotel, including correspondence from a credit card processing service regarding the establishment of a new account for the Hotel.

165. When he investigated, Napieralski learned that Halpern had engaged this credit card processing service and provided it with bank information for an account that Remington had no control over.

166. In addition to seeking to ensure that new credit card transactions went to an account under his control, Halpern also inappropriately exercised control over the operating account that Remington maintained for the Hotel at Capital Bank.

167. This account received credit card payments to the Hotel, and between October 31, 2016 and November 21, 2016, Halpern, either individually or on behalf of Southernmost, Inc. or Southernmost, made a series of transfers and withdrawals with a value totaling $277,582.80 without authorization from Remington.

168. Under Article XIV of the Agreement, Remington had exclusive authority over the Hotel's operating accounts and any withdrawal from those accounts required Remington's consent.

169. While the Agreement provides that Southernmost maintains an ownership interest in the funds, it does not provide that either Halpern or Southernmost, Inc. maintain such an interest, or that anyone other than Remington has authority over the account and its contents.

170. On November 22, 2016, Remington served a civil theft demand on Halpern, Southernmost, Inc., and Southernmost, pursuant to Fla. Stat. § 772.11(1). A copy of that letter is attached hereto as Exhibit L.

171. Neither Halpern, nor Southernmost, Inc., nor Southernmost has responded to this letter and no return of any portion of the $277,582.80 has been tendered to Remington.

172. Upon information and belief, Halpern and/or Southernmost have interfered with numerous other Remington vendor relationships and numerous other Remington employees, and Remington will determine the exact circumstances of such interference in discovery.

173. Also upon information and belief, Halpern and/or Southernmost have made additional unauthorized withdrawals from accounts under Remington's control, and Remington will determine the exact circumstances of such withdrawals in discovery.

174. On December 1, 2016, at approximately 12:00am, Halpern appeared at the Hotel with approximately six of the Police Does, all of whom wore uniforms, badges, and regulation side-arms, making plain their affiliation with the Police Department.

175. Halpern located the door to the room where the Hotel's innkeeper would stay and knocked, announcing his presence to Remington General Manager Joe Dantoni ("Dantoni") who was sleeping inside.

176. Halpern, who had keys to the Hotel's rooms, entered the room and told Dantoni that he owned the Hotel and that Dantoni needed to vacate the premises.

177. Dantoni asked Halpern, "For what reason?"

178. Halpern answered, "Because you are trespassing," and he informed Dantoni that the Police Does, who were also visible in the doorway, would arrest him if he refused to leave.

179. Upon information and belief, Halpern announced to the other Remington employees present at the Hotel that he was taking over the Hotel and the Police Does informed these employees that if they remained on the premises of the Hotel, they would be arrested.

180. Upon information and belief, all of Remington's employees at the Hotel left the Hotel in fear of prosecution.

181. Later that same day, Remington employee Willis appeared at the Hotel and Halpern offered her a job working there for Southernmost, which she declined.

182. When Remington management returned to the Hotel with Remington's counsel soon afterwards, one of the Police Does informed Remington that the Key West City Attorney, Smith, had reviewed the Agreement between Remington and Southernmost and determined that Southernmost was entitled to retake the Hotel from Remington.

183. Once again the Police Does insisted that all Remington personnel and Remington's counsel leave the Hotel or be arrested for trespassing.

184. On December 2, 2016, Remington management and Remington's counsel again returned to the Hotel and demanded to that Remington be allowed to return to manage the Hotel as provided under the Agreement, given the questions as to the parties' rights pending before the Circuit Court.

185. This time the Police Does arrested Dantoni, upon the order of City Attorney Smith, and Lee, the Police Chief, advised Remington and its counsel that they too would be arrested if they did not leave the Hotel property.

186. Remington property remains at the Hotel premises—including proprietary and intellectual property specifically protected under Article XXIV of the Agreement—and Remington has not had any opportunity to collect this property or to prevent it from being compromised by disclosure to Southernmost, which now purports to be its competitor in Key West.

**COUNT I—Deprivation of Due Process in Violation of 42 U.S.C. § 1983—Remington and Dantoni against Key West, Smith, Lee, and Police Does 1 through 10**

187. Plaintiff Remington repeats and incorporates by reference the allegations contained in paragraphs 1 through 186 of the Complaint.

188. Key West, Smith, Lee and Police Does 1 through 10, acting under color of state and local law, have deprived Plaintiff Remington and Plaintiff Dantoni of their rights and privileges secured by the Constitutions of the United States and the State of Florida.

189. Individually, and in concert, and in both their official capacities and individual capacities, as applicable, Key West, Smith, Lee, and Police Does 1 through 10 have engaged in a series of actions, which have caused Remington and Dantoni to be deprived of the essential rights of procedural due process and equal protection of the laws in violation of the Fifth and Fourteenth Amendments of the United States Constitution as set forth herein.

190. These actions include:

a. Providing a legal opinion or other authorization to oust Remington from the Hotel property and its management of the Hotel, when Remington remained in litigation with Southernmost as to its right to do so and the Stay from the Third District Court of Appeal served to maintain the status quo between Southernmost and Remington;

b. Organizing a group of Police Does to appear at the Hotel property to clear out Remington employees via the threat of arrest, without any writ of possession or other order from the Circuit Court or any other competent authority finding them to be in unlawful detainer, trespassing, or otherwise wrongfully present there;

c. Refusing to permit Remington employees to reenter the Hotel property and threatening to remove them as trespassers;

d. Otherwise acting to oust Remington without authorization or due process of law and in prejudice to its rights in a currently pending litigation;

e. Arresting Dantoni and threatening the arrest of other Remington personal and Remington's counsel in response to Remington's attempt to return to the Hotel to protect its rights under the Agreement and in the action before the Circuit Court, and its rights to its property at the Hotel.

191. The actions of Key West, Smith, Lee, and Police Does 1 through 10 were calculated to deprive Remington of its protected due process rights and property interests and were inconsistent with the Stay and preemptive of questions currently pending before the Circuit Court.

192. There is an actual, present controversy between Remington and Dantoni, on the one side, and Key West, Smith, Lee, and Police Does 1 through 10, on the other, as to Remington's right to remain at the Hotel property and manage the Hotel, and both Remington and Dantoni are in doubt as to their rights.

193. Further, there is no constitutionally adequate process to resolve this matter, as a result of the preemptive, violative of due process actions that Key West, Smith, Lee, and Police Does 1 through 10 have already undertaken.

194. Plaintiffs have retained the undersigned law firm in this matter and are obligated to pay them a reasonable fee for their services.

195. Plaintiffs have suffered monetary damages as a result of the actions as alleged

herein.

WHEREFORE, Plaintiff Remington Lodging & Hospitality, LLC and Plaintiff Joseph Dantoni respectfully request this Court enter a judgment against Key West, Smith, and Police Does 1 through 10, which determines that these Defendants violated and deprived Remington and Dantoni of their civil rights in violation of 42 U.S.C. §1983, awards Remington and Dantoni compensatory damages for such deprivation, awards Remington and Dantoni attorneys' fees pursuant to 42 U.S.C. §1988 and/or other applicable authority; awards Remington and Dantoni taxable costs and interest, and grants Remington and Dantoni such other and further relief as this Court deems just and proper.

**COUNT II—Conspiracy—Remington and Dantoni against Halpern, Key West, Smith, Lee, and Police Does 1 through 10**

196. Plaintiffs Remington and Dantoni re-allege the allegations in paragraphs 1 through 186 and 187 through 196 in this Complaint.

197. Halpern, Key West, Smith, Lee, and Police Does 1 through 10 had an agreement to deprive Remington and Dantoni of their due process rights and property interests, through an effort to oust Remington from the Hotel property, even as the question of its ouster remained pending before the Circuit Court, and without any order or other authority to effect Remington and its employees' ejectment or removal from that property.

198. Halpern, Key West, Smith, Lee, and Police Does 1 through 10 had an agreement to arrest Dantoni and any other Remington personnel who appeared at the Hotel in any attempt to assert their or Remington's rights, including its protected due process and property rights.

199. Pursuant to this agreement, Smith provided a legal opinion or other statement justifying action on Halpern's behalf and the Key West, Lee, and Police Does 1 through 10

agreed to remove Remington and its employees from the Hotel property and turn them away from the Hotel property, regardless of their attempts to assert their rights to be present there and perform pursuant to the Agreement.

200. As a result of this conspiracy between Halpern, Key West, Smith, Lee, and Police Does 1 through 10 to violate Remington and Dantoni's civil rights under to 42 U.S.C. §1983 and the U.S. and Florida Constitutions, Remington and Dantoni have suffered an amount of damages to be proven at trial.

WHEREFORE, Plaintiffs Remington Lodging & Hospitality, LLC and Joseph Dantoni respectfully request that the Court to grant them the following relief: the imposition of joint and several liability against Halpern, Key West, Smith, Lee, and Polices Does 1 through 10 for all damages resulting from their violation of 42 U.S.C. §1983 and all such other relief that this Court deems just and proper.

**COUNT III—Breach of Contract—Remington against Southernmost**

201. Remington re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint.

202. Remington and Southernmost entered into the Agreement on December 1, 2009.

203. Pursuant to Section 2.01 of the Agreement, Remington had a ten-year initial term to serve as manager of the Hotel, and three successive options to extend that term for an additional five years, until 2034.

204. During the initial, ten-year term of the Agreement—and in any of the three successive five-year renewal terms—Southernmost could only terminate that Agreement pursuant to the Agreement's own terms. *See* Agreement, Section 2.01 and 27.02.

205. In the event that Remington defaulted on any of its obligations under the Agreement, Southernmost could only terminate the Agreement by providing reasonably specific notice to Remington and by allowing Remington an opportunity to cure. *See* Agreement, 19.01.

206. The notice and cure requirements of the Agreement applied to **any** default under the Agreement, except for those set forth in Sections 19.01.A-D.

207. Southernmost breached the Agreement on October 31, 2016, by attempting to terminate it prior to the conclusion of the initial term and by not following the Agreement's requirements for termination, including the requirement that Southernmost provide Remington reasonably specific notice and an opportunity to cure.

208. Southernmost also breached the Agreement by attempting to terminate it based on defaults that either never occurred, or occurred as a result of employee misconduct for which Southernmost agreed to indemnify Remington and hold it harmless, or occurred as a result of Southernmost's own wrongdoing.

209. Because Southernmost attempted to terminate the Agreement without providing Remington with reasonably specific notice and an opportunity to cure and based on defaults that never occurred or defaults for which Southernmost could not hold Remington liable, Southernmost owed Remington a minimum of 240 days to conclude its management of the Hotel, as well as a termination fee "equal to three (3) times the greater of (i) the Management Fee that was estimated to be paid to Manager with respect to the Hotel pursuant to the Annual Operating Budget for the remaining Accounting Periods or (ii) the actual Management Fee paid for the immediately preceding twelve (12)-month period." *See* Agreement, Sections 2.03.C-D.

210. The termination fee was due "upon" Southernmost's attempted termination of the Agreement on October 31, 2016, to the extent that such an attempted termination constituted a termination without cause. *See id.*, Section 2.03.D.

211. Southernmost failed to pay the termination fee and breached the Agreement. *See id.*

212. Pursuant to Sections 4.01 and 4.02 of Agreement, Southernmost appointed Remington its agent and delegated to Remington the entirety of its authority over the Hotel, agreeing that Remington would "have discretion and control in all matters" relating to the Hotel's operation.

213. Pursuant to Article XVII of the Agreement Southernmost Agreement that it would "not itself engage in any actions that could be construed as management of the [Hotel], including without limitation, communication, interaction with or direction of [Hotel] employees, guests or vendors."

214. Southernmost breached the Agreement by regularly disregarding its delegation of authority to Remington and by regularly communicating with, interacting with, and directing Hotel employees and vendors in such a way that interfered with their work and ultimately resulted in the resignation of many of them.

215. Under Section 8.02 of the Agreement, Southernmost had an obligation to increase the Hotel's annual reserve, but Southernmost failed to increase the annual reserve each year, attempting to shift the cost of necessary repairs to the Hotel onto Remington and leaving it no choices other than paying for the repairs itself, or terminating the Agreement.

216. Pursuant to Sections 9.03 and 25.02 of the Agreement, Southernmost also had an obligation to hold Remington harmless for the wrongdoing of its employees.

217. Southernmost breached these provisions of the Agreement by declaring Remington to be in breach of the Agreement for employee's wrongdoing beyond its control.

218. Under Article XIV of the Agreement, Remington had exclusive authority over the Hotel's operating accounts and any withdrawal from those accounts required Remington's consent.

219. Southernmost breached the Agreement by withdrawing $277,582.80 from the Hotel's operating account, without any authorization from Remington.

220. Pursuant to Section 2.403 of the Agreement, Remington owns all of intellectual property that it developed during the course of its management of the Hotel.

221. Southernmost breached the Agreement by coopting that intellectual property for itself.

222. As a direct and proximate result of Southernmost's breaches, Remington has suffered actual and consequential damages equal to not less than $1,262,247.00 in liquidated damages, and not more than its reasonable expectation interests in the Agreement over a period of 19 years, as well as actual and consequential damages from costs expended to recruit, hire, and train new employees to replace those who resigned as a result of Southernmost's interference, maintenance and repair costs expended, the cost of intellectual property or otherwise compromised, and attorneys' fees and costs incurred.


HELLER WALDMAN, P.L.
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

223. Pursuant to Section 27.05 of the Agreement, Remington is entitled to its reasonable attorneys' fees, costs and necessary disbursements in connection with any action to enforce the Agreement.

WHEREFORE, Plaintiff Remington Lodging & Hospitality, LCC respectfully demands judgment in its favor for Defendant Southernmost House, Ltd.'s beach of the parties' December 1, 2009 Hotel Management Agreement and for actual and consequential damages, including attorneys' fees, costs, and interest, and for all such other relief the Court deems just and proper.

**COUNT IV—Breach of the Implied Covenant of Good Faith and Fair-Dealing—
Remington against Southernmost**

224. Remington re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint.

225. Remington and Southernmost entered into the Agreement on December 1, 2009.

226. Remington has performed all, or substantially all, that is required of it under the Agreement, successfully managing the Hotel to increased profitability year-over-year for more than five years and maintaining and improving the Hotel's status among its "Competitive Set."

227. Southernmost excused Remington from certain management obligations by permitting and even affirming alternative management practices during the course of the parties' contractual relationship, including, but not limited to, the use of paper ticket system for day-passes and the absence of a modern point of sale system at the Hotel bar.

228. All conditions required for Southernmost's performance under the Agreement have occurred and continue to occur.

229. But Southernmost breached the Agreement's implied covenant of good faith and fair dealing by refusing to pay for items that Remington reasonably proposed to include in the

Capital Improvement Budget and using that budgeting process to shift the cost of repairing and maintaining the Hotel on to Remington, and it further breached the implied covenant of good faith and fair dealing by serving Remington with a notice of default that failed to identify either specific defaults or cures and then refusing to offer Remington any clarification as to how it could undertake to perfect its cure rights.

230. Southernmost also breached the Agreement's implied covenant of good faith and fair dealing by relying on contrivances of Remington's wrongdoing, rather than any actual wrongdoing by Remington, to allege Remington's default under the Agreement and Remington's purported acts of bad faith and scheme to cheat Southernmost—which Remington in no way committed or engaged in.

231. Southernmost's conduct did not comport with Remington's reasonable contractual expectations under Sections 8.02 and 19.01.F of the Agreement.

232. As direct and proximate result of Southernmost's failure to conduct itself in comportment with reasonable contractual expectations, Remington has suffered actual and consequential damages equal to not less than $1,262,247.00 in liquidated damages and not more than its reasonable expectation interests in the Agreement over a period of 19 years, as well as actual and consequential damages from maintenance and repair costs expended and attorneys' fees and costs incurred.

233. Pursuant to Section 27.05 of the Agreement, Remington is entitled to its reasonable attorneys' fees, costs and necessary disbursements in connection with any action to inforce the Agreement.

WHEREFORE, Plaintiff Remington Lodging & Hospitality, LCC respectfully demands judgment in its favor for Defendant Southernmost House, Ltd.'s beach of the implied covenant of good faith and fair dealing inherent in the parties' December 1, 2009 Hotel Management Agreement and for actual and consequential damages, attorneys' fees, costs, and interest, and for all such other relief the Court deems just and proper.

**COUNT V—Breach of Fiduciary Duty—Remington against Southernmost**

234. Remington re-alleges the allegations in paragraphs 1 through 186 of this Complaint.

235. Pursuant to Section 4.01 of the Agreement, Southernmost and Remington have formed a principal-agent relationship.

236. Southernmost, as Remington's principal, has fiduciary duty to deal with Remington fairly and in good faith, to furnish Remington with information, and to refrain from conduct likely to harm Remington's business reputation.

237. Southernmost breached its fiduciary duty to Remington by wrongfully and unjustifiably declaring it to be in default under the Agreement, in an action which likely and ultimately damaged Remington's business reputation.

238. Southernmost breached its fiduciary duty to Remington by demanding that Remington perform obligations not set forth in the Agreement, such as refraining from competing against Southernmost.

239. The Agreement, in fact, authorized such competition, and it was an unfair act of bad faith for Southernmost to demand otherwise and declare Remington in default for doing so.

240. Southernmost also breached its fiduciary duty to Remington by failing to inform Remington of the specific conduct or conditions that Southernmost alleged to be breaches under the Agreement, undermining Remington's ability to perform as its agent.

241. As a direct and proximate result of Southernmost's breaches of fiduciary duty, Remington has suffered actual and consequential damages, including its damages in an amount equal to reasonable expectation interests in the Agreement over a period of 19 years, damages to its reputation as a nationwide manager of hotel properties.

WHEREFORE, Plaintiff Remington Lodging & Hospitality, LCC respectfully demands judgment in its favor for Defendant Southernmost House, Ltd.'s breach of fiduciary duty and for actual and consequential damages, costs, and interest, and for all such other relief the Court deems just and proper.

## COUNT VI—Tortious Interference with Contractual Relationships—Remington against Southernmost and Halpern

242. Remington re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint.

243. Remington had business relationships with its employees at the Hotel, including managers, innkeepers, front desk persons, bartenders, and housekeepers.

244. Southernmost and Halpern had knowledge of these business relationships, including the trust Remington reposed in these employees and the value it invested in their continued employment for the company.

245. Southernmost and Halpern intentionally interfered with Remington's relationships with these employees by harassing them, undermining their sense of job security, and interfering with their work at the Hotel.

246. There is no justification for Southernmost's interference.

247. As a direct and proximate result of Southernmost's interference, Remington had been damaged, by having to recruit, hire, and train these employees replacements and by declines in guest service that decreased the profitability of the Hotel.

WHEREFORE, Plaintiff Remington Lodging & Hospitality, LCC respectfully demands judgment in its favor for tortious interference with its business relationships with its former employees and damages in an amount to be determined at trial, all costs of this action, and all other relief this Court deems just and proper.

**COUNT VII—Fraudulent Misrepresentation—Remington against Southernmost and Halpern**

248. Remington re-alleges the allegations contained in paragraphs 1 through 186 of this Complaint.

249. Southernmost and Halpern made a false statement of a material fact, when Southernmost promised to honor the ten-year term of the Agreement and to honor Remington's three successive options to renew the agreement for three successive five-year terms.

250. Southernmost and Halpern made this promise to Remington with no intention of performing it.

251. Halpern executed the Agreement with the deliberate intention to either force its renegotiation or to effectuate a scheme to terminate it for cause under false pretenses.

252. Southernmost and Halpern knew that Southernmost would not honor the Agreement when they entered into it and that they executed the Agreement to perpetrate a fraud on Remington, which would cause it to invest in the Hotel and in the marketing of the Hotel, without realizing the long-term benefits of its investment.

253. Southernmost and Halpern intended for Remington to rely on the Agreement as a long-term commitment with a potential term of 25 years.

254. Remington executed the Agreement and incorporated the Hotel into its marketing programs and invested into the Hotel premises in reasonable reliance that it would perform under the Agreement until the expiration of its Term.

255. As a result of Remington's reliance on Southernmost's and Halpern's fraudulent misrepresentation about Southernmost's intent to perform the Agreement, Remington has been damaged.

` WHEREFORE, Plaintiff Remington Lodging & Hospitality, LCC respectfully demands judgment in its favor and against Defendant Southernmost House, Ltd. and Defendant Michael Halpern for their Fraudulent Misrepresentation, and for actual and consequential damages, including costs, and interest, and all such other relief the Court deems just and proper.

**COUNT VIII—Breach of FDUTPA—Remington against Southernmost**

256. Remington re-alleges the allegations contained in paragraphs 1 through 186 and in paragraphs 249 through 255 in this Complaint.

257. This is a claim for violation of Fla. Stat. §501.204, et seq.

258. FDUTPA renders unlawful unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.

259. At all relevant times, Defendant Southernmost was engaged in trade or commerce as defined in Fla. Stat. §501.203.

260. At all relevant times, Plaintiff Remington was a consumer as defined by §501.203.

261. As set forth above, by implementing a scheme to have Remington market the Hotel and build its business, while falsely promising Remington a share of its long-term profits, Defendant Southernmost engaged in deceptive and unfair behavior in Florida, aimed at stealing work and know-how from a competitor in the Key West lodging and hospitality market.

262. As a result of Southernmost's deceptive acts, Remington has suffered actual and consequential damages in an amount to be determined at trial and based upon its expectation interests in the Agreement.

263. Remington is entitled to an award of attorneys' fees from Southernmost for its deceptive and unfair trade practices, pursuant to Florida Statutes §501.2105.

WHEREFORE, Plaintiff Remington Lodging & Hospitality, LCC respectfully demands judgment in its favor and against Defendant Southernmost House, Ltd. for its violation of the Florida Deceptive and Unfair Trade Practices Act, including actual and consequential damages, including attorneys' fees, costs, and interest, and all such other relief the Court deems just and proper.

**COUNT IX—Civil Theft—Remington against Halpern and Southernmost, Inc.**

264. Plaintiff Remington repeats and incorporates by reference the allegations contained in paragraphs 1 through 186 of this Complaint.

265. Between October 31, 2016 and November 21, 2016, Southernmost, Inc. or Halpern wrongfully withdrew amounts totaling $277,582.80 from the Better Business Checking Account (the "Account") that Remington maintained for the Hotel at Capital Bank.

266. Southernmost, Inc. or Halpern took this money via a series of six transactions, which Remington did not authorize, or approve.

267. Neither Southernmost, Inc., nor Halpern had any direct ownership interest in these funds and pursuant to Section 4.02 and Article XIV of the Agreement, Remington alone had "supervision and control" over the Account and the sole right to authorize withdrawals from the Account.

268. Moreover, at the time that Southernmost, Inc. or Halpern made these six wrongful withdrawals, Remington had already either paid out or allocated these funds to third parties, in its capacity as Southernmost's agent.

269. Remington had a legally recognized property interest in these funds, both as agent of Southernmost and as payee of these funds, and Southernmost, Inc. or Halpern withdrew these funds with the felonious intent to deprive Remington of this interest and convert these funds for its or his own use.

270. Based on Southernmost, Inc. or Halpern's wrongful conduct, Remington is entitled to recover treble damages for the $277,582.80 Southernmost, Inc. or Halpern converted from the Account.

271. On November 22, 2016, Remington submitted a civil theft demand letter to Southernmost. *See* Exhibit L.

WHEREFORE, Plaintiff Remington Lodging & Hospitality, LLC respectfully requests that this Court enter judgment in its favor and against Defendant Southernmost House, Inc. and Defendant Michael Halpern for the damages Remington has suffered as a result of the above-alleged civil theft, including compensatory damages, consequential, treble damages, interest, attorney's fees pursuant to Fla. Stat. 772.11, costs, and all other relief this Court deems just and proper.


HELLER WALDMAN, P.L.
3250 MARY STREET, SUITE 102 ● COCONUT GROVE, FLORIDA 33133

## **JURY TRIAL DEMAND**

Remington hereby demands a trial by jury for all claims so triable.

Dated: December 2, 2016

Respectfully submitted,

HELLER WALDMAN, P.L.
3250 Mary Street, Suite 102
Coconut Grove, Florida 33133
Telephone: (305) 448-4144
Telecopier: (305) 448-4155

By: /s/ Glen H. Waldman
Glen H. Waldman
Fla. Bar No. 618624
Michael A. Azre, Esq.
Fla. Bar No. 83522

***Attorneys for Plaintiffs***